NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-296

PAULA KIELY

vs.

DEPARTMENT OF MENTAL HEALTH & another.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Paula Kiely, brought this action against her employer, the Department of Mental Health (DMH), and Paulette Moulding, the Director of Nursing at the DMH facility where Kiely worked, alleging discrimination on the basis of disability and retaliation in violation of G. L. c. 151B.[2]  Kiely, who was employed as a "registered nurse 2" (RN2), claimed that she was a

_____

[1] Paulette Moulding.

[2] Kiely filed a six count complaint, alleging (1) discrimination on the basis of disability in violation of G. L. c. 151B, §§ 4(16), (4), and (4A) against DMH (counts one and two) and Moulding (count five), and (2) retaliation against the department and Moulding in violation of G. L. c. 152, § 75B(2) (counts three and six respectively).  Kiely does not challenge the dismissal of count four, which alleged a violation of G. L. c. 151B, § 4(16), against Moulding.

qualified person with a disability, whom DMH had discharged without making a reasonable accommodation. Kiely's complaint also alleged that she was discharged in retaliation for protected activity including, among other things, that she filed an internal complaint alleging sexual harassment against Moulding's husband, Michael.[3] Before us is Kiely's appeal from a summary judgment entered in the Superior Court dismissing her claims. We affirm.

Background. We summarize the relevant facts in the light most favorable to Kiely, the nonmoving party. See Lyons v. Nutt, 436 Mass. 244, 245 (2002). In 2007, Kiely began working for DMH as an RN2 at Taunton State Hospital where she provided direct care to adult patients in locked units. Kiely worked overnight shifts under Michael's supervision. Sometime in 2010 or 2011, Kiely filed an internal complaint alleging that Michael sexually harassed her. Thereafter, Kiely switched to a different shift and no further action on her complaint was taken.

In October 2012, DMH decided to close the Taunton facility and notified all employees that they would be reassigned. Kiely was transferred to the Corrigan Mental Health Center in Fall

---

[3] Because Paulette and Michael Moulding share the same surname, we refer to Michael Moulding by his first name to avoid confusion.

River (Corrigan), where she worked full-time as an RN2 and provided direct care to patients in locked units under the supervision of Cherie Cuff. As set forth in a 2007 position description, Kiely's duties and responsibilities included: "[f]unction[] as a member of the multidisciplinary treatment team, assume responsibility for nursing care on the Inpatient Unit," "[a]ccept[] responsibility [for] and assure[] patient safety," and "[p]rovide primary nursing care to an assigned group of patients" and manage "all codes and unexpected emergencies during tour of duty." In July 2013, Kiely's employee performance review, completed by Cuff, was largely positive.

About a month later, in August 2013, Moulding was promoted to the position of Director of Nursing at Corrigan and in that role was responsible for supervising Cuff, Kiely, and the rest of the nursing staff. In her complaint, Kiely alleged that frictions, sparked by her allegations of sexual harassment against Michael, quickly developed between her and Moulding and that Moulding targeted, harassed, and generally treated her differently than other employees. Kiely also alleged that Moulding denied her requests for educational opportunities and falsely accused her of inappropriate use of sick time. Cuff's review of Kiely's performance in February of 2014 was also largely positive; however, Cuff noted that Kiely occasionally

3

"has a negative, oppositional attitude towards supervision." Moulding also signed the performance review.

About seven months later, on October 1, 2014, Kiely met with her union representative, Cuff, and Moulding to discuss what she claimed to be a hostile working environment created by Moulding. Moulding claimed it was at this meeting that she heard about Kiely's allegation against her husband for the first time.[4] Following the meeting, Moulding spoke to Corrigan's site director, Roberta Guez, who asked for a written summary of Kiely's allegations, which Moulding provided in an email. In that email, Moulding reported that Kiely feels that she is "devalued" and mistreated. Moulding further wrote that Keily "[s]tates she cannot work for/with me" and that "she is 're-traumatized every time [she] look[s] at [me] . . . because of what [my] husband, Michael[,] did to [her] . . . .'". Moulding also wrote that she had recently learned that Kiely "has told some people here at Corrigan that my husband sexually harassed her while he supervised her at Taunton and that she filed charges against him." Expressing her concern, Moulding relayed that, if Kiely's claim that she had filed charges was false,

---

[4] There is conflicting evidence as to when Moulding first learned of Kiely's allegations against her husband. For purposes of this appeal, we view the evidence in the light most favorable to Kiely and, like the judge, we assume without deciding that Moulding was aware of Kiely's internal complaint against Michael at some point prior to the October 1 meeting.

4

"then telling people she did is defaming my husband's character and good name, and by extension, that reflects on me as well.  I am understandably upset by this . . . ."  Kiely also spoke with Guez about the situation, who told her "to get over it" because Moulding was not going anywhere.

About three months later, on January 10, 2015, Kiely suffered a workplace injury while restraining a patient and severely injured her back.  Kiely was unable to work because of the injury and received workers' compensation benefits and eventually qualified for leave under the Family and Medical Leave Act (FMLA).  In order to determine ongoing eligibility for these benefits, Kiely was examined by various physicians, including her treating physician, who opined that Kieley was unable to have "patient contact due to possibility of restraining patient[s]."  On April 28, 2015, Kiely underwent an independent medical exam (IME).  The results of the exam were that Kiely was capable of working in a modified capacity and "should not lift more than 15 to 20 pounds and . . . avoid restraints of patients."  In a letter dated May 15, 2015, Patricia Boyle, a workers' compensation manager, informed Kiely that DMH would permit Kieley to return to work as an RN2 with a temporary modified work plan, which specified Kiely would not be required to restrain any patients.  Kiely determined that she

5

could not accept this offer because, in her view, she would still be required to restrain patients should the need arise.

In her deposition, Kiely acknowledged that any patient contact would create a risk of restraining patients and that she was seeking an administrative position, "anything not involving direct patient care." Although Kiely claimed that other employees had been accommodated in the manner she requested, when asked the question whether she knew of an RN2 position within DMH that involved no patient contact, she responded, "Not that I can recall at this time."

Kiely's FMLA leave was extended multiple times and, eventually, she applied for disability retirement. While Kiely's application was pending, she exhausted all available leave. By letter dated February 6, 2017, DMH notified Kiely that she had been placed on unauthorized leave and was expected to return to work. Kiely did not respond to this letter and on June 5, 2017, DMH notified Kiely that it would hold a nondisciplinary show cause hearing to determine whether further steps "up to and including separation from employment" would be taken as a result of Kiely's "Inability to Perform the Essential Functions of [her] Position/Failure to Return To Work." The hearing took place on July 10, 2017, and the hearing officer

6

issued her findings on November 28, 2017.[5]  She found that Kiely was unable to perform the essential functions of her RN2 position and recommended that her employment be terminated, which DMH did on December 7, 2017.

The record contains evidence from which it can be inferred that some employees were pleased by the news of Kiely's termination.  Lisa Doherty, DMH's liaison to the workers' compensation board, sent an e-mail message, dated December 13, 2017, to Patricia Boyle, in which she stated:  "does it make you feel all Christmassy inside, your buddies are getting termination notices in their stocking, . . . figured it might put you in the Christmas spirit . . . ."

As previously noted, Kiely sued, and the defendants moved for summary judgment.  Following a hearing, the judge concluded that the undisputed facts established that "Kiely was not a qualified handicapped person because she could not restrain patients, an essential function of the RN2 position," and that Kiely therefore "cannot establish a claim for employment discrimination against" DMH.  The judge further concluded that the undisputed facts establish that neither DMH nor Moulding

---

[5] We note that Kiely underwent another IME on September 30, 2017, before the hearing officer issued her report.  The doctor opined that Kiely had reached "a medical end result" and that "[Kiely] is capable of working 8 hours a day, 5 days a week as a registered nurse.  She cannot be involved with the use of force or restraint."

7

terminated Kiely's employment in retaliation for engaging in protected activity, namely, the filing of complaints against Moulding and Michael. Relying on Mole v. University of Mass., 442 Mass 582, 592 (2004), the judge determined that Kiely could not show a causal relationship between the protected conduct and the adverse action noting that there was no dispute that Kiely was terminated nearly four years after Moulding became the director of nursing at Corrigan, and therefore, the "gap between the protected conduct and presumed adverse action is too remote to show a causal connection." Lastly, the judge concluded that Moulding was entitled to summary judgment on Kiely's claim under G. L. c. 152, § 75B (1), because that section of the statute applies to employers and not employees.

Discussion. We review a grant of summary judgment de novo to determine "whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." Augat, Inc. v. Liberty Mut. Ins. Co., 410 Mass. 117, 120 (1991). Kiely contends that summary judgment was improper because there are genuine issues of material fact regarding (1) the essential functions of the position of an RN2, (2) whether she could perform those functions with a reasonable accommodation, and (3) whether there was a causal relation between her protected activity and the actions taken against

8

her.[6]  Our review of the record does not support Kiely's
arguments.

Cases alleging discrimination based on disability generally
proceed in the familiar three stage order of proof frequently
articulated in our cases.  See generally Verdrager v. Mintz,
Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382
(2016).  The first stage requires Kiely to establish a prima
facie case of handicap discrimination.[7]  Id. at 396.  "At the
summary judgment stage, therefore, the question is whether the
record contains a genuine issue of material fact regarding
[Kiely's] ability to do so."  Tompson v. Department of Mental
Health, 76 Mass. App. Ct. 586, 593 (2010).

Here, in order to meet her burden, Kiely was required to
establish that she "is handicapped, that she is a qualified
handicapped person, and that she was terminated because of her
handicap" (quotations and citation omitted).  Tompson, 76 Mass.

_____

[6] Kiely also argues that the judge impermissibly made
findings of fact and credibility determinations.  We view these
arguments as encompassed within the claim that there are genuine
issues of material fact.

[7] The second and third stages, which we need not address,
are whether "the employer can rebut the presumption by
articulating a lawful reason or reasons for its employment
decision" and the obligation of the employee to then "show that
the basis of the employer's decision was unlawful
discrimination" (quotation and citation omitted).  Abramian v.
President & Fellows of Harvard College, 432 Mass. 107, 116-117
(2000).

App. Ct. at 593. Although our review is de novo, we agree with the judge that the summary judgment record demonstrates that Kiely was not a qualified person with a disability.[8]

General Law c. 151B defines a "qualified handicapped person" as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation to [her] handicap." G. L. c. 151B, § 1 (16). Kiely does not dispute that she was not capable of restraining patients. Instead, she argues that restraining patients was not an essential function of her job and, even if that were so, the accommodation she sought, an administrative position, which involved no direct patient care, was possible and would have allowed her to continue to perform the job of an RN2.

Accordingly, we address the question whether restraining patients is an essential function of the RN2 position. An essential function of a position is a function that "must necessarily be performed by an employee in order to accomplish the principal objectives of the job" (citation omitted). School

_____

[8] Given our conclusion that Kiely is unable to meet this prong of the statutory definition, we need not address whether at trial she could meet the other two prongs, that is whether she is a person with a disability and whether she was terminated because of her disability.

10

Comm. of Norton v. Massachusetts Comm'n Against Discrimination, 63 Mass. App. Ct. 839, 846 (2005). Determining whether a particular job duty is an "essential function is intensely fact-based," requiring "'individualized inquiry and . . . appropriate findings of fact.'" Cargill v. Harvard Univ., 60 Mass. App. Ct. 585, 587 (2004), quoting Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 383 (1993). Our review of the record leaves no doubt that, at a minimum, one of the duties of an RN2 at Corrigan was to provide direct care to psychiatric patients in locked units. That, in turn, requires an RN2 to have the knowledge of restraint protocols and the capability of restraining a patient should the need arise. The position description dated July 1, 2007, which was in effect at the time Kiely was hired and to which we have previously referred, supports our conclusion. That description expressly requires RN2 nurses to "assume responsibility for nursing care on the Inpatient Unit" and "[a]ccept[] responsibility and assure[] patient safety." More specifically, under the section entitled, "DETAILED STATEMENT OF DUTIES AND RESPONSIBILITIES," an RN2 is required to "[p]rovide primary nursing care to an assigned group of patients utilizing nursing process and following current standards of care" and "[p]rovid[e] professional expertise and knowledge in carrying out emergency functions, all codes and unexpected emergencies

11

during tour of duty."[9]  Furthermore, as Kiely admitted in her deposition, the patients in the locked units were "[v]olatile," and depending on the particular unit, an RN2 might need to restrain patients "every day."  At some point, ensuring the safety of a volatile patient would inevitably require an RN2 to have the ability to restrain that patient.  See Cox, 414 Mass. at 386-388 & 388 n.4 (job function may be essential even if only sometimes necessary).

We next turn to the question of whether the administrative position Kiely requested amounted to a reasonable accommodation that would have permitted her to perform the relevant essential functions of an RN2, and that DMH was, therefore, required to provide it.  The answer is no.  In effect, Kiely sought a fundamentally different position; one that did not require any direct patient care.  DMH was not required to accommodate such a request.  See Tompson, 76 Mass. App. Ct. at 596.  Moreover, as the judge noted, the record does not contain evidence to support Kiely's assertion in her complaint that RN2 positions which do not require restraining patients are "regularly available at

---

[9] It is true, as Kiely notes, that the judge, and to some extent DMH, incorrectly relied on a later version of the job description, dated August 17, 2017, which was in effect for the three months preceding Kiely's discharge.  Unlike the 2007 version, the 2017 version included the ability to participate "in patient restraint for safety purposes as needed" as a specific duty and responsibility.  We do not rely on the 2017 position description in reaching our conclusion.

12

Corrigan or at another DMH facility."[10]  Cuff's deposition testimony, on which Kiely relies, is not to the contrary.  Cuff testified that "[t]here [aren't] any light duty positions," positions that would not require the restraint of patients, "on the inpatient unit" or at Corrigan.  See Cox, 414 Mass. at 386 n.3 (employee must "make at least a facial showing that reasonable accommodation is possible" [citation omitted]).  See also Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119-120 (2010).

In sum, we discern no genuine dispute of material fact that (1) the essential functions of the job of an RN2 included restraining patients; (2) Kiely was not capable of performing that function with or without a reasonable accommodation; and (3) the accommodation she requested was not possible.  Consequently, the summary judgment record demonstrates that Kiely is not a "qualified handicap person" and the defendants are entitled to summary judgment on Kiely's claim of disability discrimination under G. L. c. 151B, § 4 (16).

Kiely's complaint also alleged that she was discharged in retaliation for filing a sexual harassment case against Michael, hostile work environment complaint against Moulding, and claims

_____

[10] Kiely makes the same argument in her brief.  However, there is no support for it in the record.

for workers' compensation and assault pay.[11]  Although

"[r]etaliation is a separate and independent cause of action"

from a claim of discrimination under G. L. c. 151B, § 4 (16),

there are similarities between the two.  Abramian v. President &

Fellows of Harvard College, 432 Mass. 107, 121 (2000).  As with

her claim of discrimination on the basis of disability, Kiely

bore the initial "burden to establish a prima facie case."  Id.

at 116.  In order to meet this burden, Kiely had to show that

she engaged in protected conduct, suffered some adverse action,

and that "a causal connection existed between the protected

conduct and the adverse action."  Mole, 442 Mass. at 591-592,

quoting Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st

Cir. 1991), cert. denied, 504 U.S. 985 (1992).

There is no question that at least some of Kiely's actions

as described above qualify as protected activity and that Kiely

suffered an adverse employment action when she was terminated.

However, as the judge concluded, there was insufficient evidence

to establish a causal link between Kiely's protected conduct and

her discharge to permit an inference of retaliation.  Assuming

---

[11] We agree with the defendants that the termination of
Kiely's employment was the only adverse employment action that
resulted in a reduction of salary or change in working
conditions that materially disadvantaged her.  Consequently, her
discharge is the only action we consider in determining whether
Kiely has shown she was subjected to an adverse employment
action.  See MacCormack v. Boston Edison Co., 423 Mass. 652,
662-663 (1996).

14

without deciding that Moulding targeted and harassed Kiely based on Kiely's complaint of sexual harassment against Michael and Kiely's complaint against her for creating a hostile work environment, the time span between those events and Kiely's termination is "too long to support [Kiely's] desired inference of causation." Mole, 442 Mass. at 595.

Moulding became the director of nursing in the fall of 2013, and Kiely made her complaint against her in October 2014. Kiely's employment was terminated approximately four years after Moulding arrived at Corrigan and three years after Kieley complained about being mistreated by Moulding. In this instance, even though protected activity preceded the adverse employment action, without more, "[t]he evidence is too tenuous to support a[] [reasonable] inference" of causation. Dube v. Middlesex Corp., 59 Mass. App. Ct. 734, 741 (2003); see id. at 740-741 & 741 n.3 (insufficient evidence of causation where protected activity and adverse action separated by at least nine months). The same reasoning, a lack of causation, applies to Kiely's argument that DMH retaliated against her for seeking workers' compensation and assault pay. We therefore conclude that Kiely failed to establish a prima facie case of retaliation and summary judgment in favor of the defendants was proper.

Lastly, Kiely argues that her claim for retaliation against Moulding under G. L. c. 152, § 75B, should not have been

15

dismissed.  She argues, incorrectly, that the judge erred by concluding that the statue applies only to employers and not employees.  Our review of the statute and case law supports the judge's conclusion.  The statute provides the following, in pertinent part:  "[n]o employer or duly authorized agent of an employer shall discharge . . . an employee because the employee has exercised a right afforded by this chapter."  Ourfalion v. Aro Mfg. Co., 31 Mass. App. Ct. 294, 297 (1991), quoting G. L. c. 152, § 75B(2).  Moulding was not Kiely's employer, nor was she an authorized agent of DMH.  To the contrary, Moulding, like Kiely, was an employee and, as a result, was not liable under the statute.

Judgment affirmed.

By the Court (Vuono,
  Ditkoff & D'Angelo, JJ.[12]),

Clerk

Entered:  July 23, 2026.

---

[12] The panelists are listed in order of seniority.

16